UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

KIMBERLY JAKUBOWSKI,

                              Plaintiff,            **MEMORANDUM & ORDER**
                                                    15-CV-6530 (MKB)

              v.

NANCY A. BERRYHILL[1]
*Acting Commissioner, Social Security*
*Administration*,

                              Defendant.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Kimberly Jakubowski filed the above-captioned action pursuant to 42 U.S.C.

§ 405(g) seeking review of a final decision of the Commissioner of Social Security (the

"Commissioner") denying her claim for social security disability benefits under the Social

Security Act (the "SSA").  (Compl., Docket Entry No. 1.)  Plaintiff moves for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that

Administrative Law Judge Patrick Kilgannon (the "ALJ") erred by (1) improperly weighing the

medical opinion evidence and (2) failing to consider the effects of Plaintiff's pain and pain

medications in assessing her residual functional capacity ("RFC").  (Pl. Mot. for J. on the

Pleadings, Docket Entry No. 14; Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem.") 1, Docket Entry No.

15.)  The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ's

decision is supported by substantial evidence and should be affirmed.  (Comm'r Cross-Mot. for

_____

        [1]  Pursuant to Fed. R. Civ. P. 25(d), the caption has been updated to reflect the new
Acting Commissioner of Social Security, Nancy A. Berryhill, who took office on January 23,
2017.

J. on the Pleadings, Docket Entry No. 16; Comm'r Mem. in Supp. of Def. Cross-Mot. ("Comm'r Mem.") 1, Docket Entry No. 17.)  For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied.

## I. Background

Plaintiff was born in 1982.  (Certified Admin. Record ("R.") 130, Docket Entry No. 7.) Plaintiff graduated high school in 2000 and worked as a nursing aide in the maternity ward of Staten Island University Hospital from mid-2000 to September of 2011.  (R. 49–50, 140–47, 160–62.)  Plaintiff is married and has three children.  (R. 130–31.)  On September 7, 2012, Plaintiff applied for social security disability benefits, alleging she was disabled as of September 20, 2011, due to "stenosis of the spine and back injury."  (R. 151.)  Plaintiff's application was denied after initial review, and she subsequently requested a hearing before the ALJ.  (R. 71–82.) Plaintiff appeared with her attorney before the ALJ on March 7, 2014.  (R. 42–60.)  By decision dated May 28, 2014, the ALJ determined that Plaintiff was not disabled and denied Plaintiff's application.  (R. 24–41.)  On September 10, 2015, the Appeals Council denied review of the ALJ's decision.  (R. 1–7.)

### a. Plaintiff's testimony

At the March 7, 2014 administrative hearing, Plaintiff testified that she, her husband and their three children lived with Plaintiff's parents.  (R. 49–50.)  After graduating from high school, Plaintiff worked for twelve years as a nursing assistant and personal care aide in the maternity ward of Staten Island University Hospital.  (R. 50–51.)  Plaintiff explained that she was injured when she was assisting a heavy patient who fell on top of her.  (R. 51.)  As a result, Plaintiff sustained injuries to her lower back and numbness and tingling down her legs.  (R. 51–

52.)  Plaintiff had seen a chiropractor, undergone physical therapy, acupuncture, two epidurals and non-invasive electro-stimulation therapy ("scrambler therapy").  (R. 51.)  At the time of the hearing, she was prescribed and taking Exalgo, Motrin 800, Tramadol, Klonopin and Flexeril and she wore a morphine patch for her pain.  (R. 52.)  Plaintiff's medications made her "very drowsy" and prevented her from having a daily routine.  (R. 52.)  She was able to braid her daughter's hair but could not otherwise take care of her children by herself.  (R. 52.)  Plaintiff did not leave the house often because she lacked money and required the flexibility to sit and stand at will.  (R. 53.)  She had not undergone surgery, to date.  (R. 53.)  Plaintiff explained that some of her medication was intended to treat anxiety and depression.  (R. 53.)

### b.  Vocational expert testimony

Gerald Bellcheck, a vocational expert, testified that Plaintiff's past work as a personal care aide at a hospital was a semi-skilled occupation with a specific vocational preparation of four and required medium exertion.  (R. 51.)  He testified that a hypothetical person of Plaintiff's age, education and work experience could not perform Plaintiff's past work if her residual functional capacity limited her to: (1) lift up to twenty pounds occasionally and lift or carry up to ten pounds frequently; (2) stand or walk for approximately six hours per eight-hour work day and sit for approximately six hours per eight-hour work day with "normal breaks"; (3) occasionally climb ramps or stairs, balance, stoop, crouch, kneel and crawl, but not climb ladders or scaffolds; and (4) operate without mental non-exertional or visual communicative limitation.  (R. 55–56.)  However, Bellcheck testified that the same hypothetical person could perform unskilled work as a "cashier II" with a "sit/stand option," an office mail clerk, or a companion or personal attendant in someone's home.  (R. 55–56.)  The ALJ asked Bellcheck whether his analysis would change if the hypothetical person had a "sedentary exertional

limitation," meaning she could lift up to ten pounds occasionally, stand or walk for approximately two hours per eight-hour work day and sit for approximately six hours per eight-hour work day with "normal breaks." (R. 56–57.) Bellcheck testified that someone with those limitations could perform unskilled, sedentary work as an order clerk, taking telephone orders at large hotels; a bench or final assembler at a manufacturing plant; or a charge account clerk at a department store. (R. 57.) Finally, the ALJ asked Bellcheck whether a hypothetical person who could occasionally lift up to ten pounds, sit for fewer than two hours in an eight-hour work day and stand or walk for fewer than two hours in an eight-hour work day could perform any work. (R. 58.) Bellcheck testified that such a person would be precluded from working in the national economy. (R. 58.)

### c. Medical evidence

#### i. Medical evidence before the alleged onset date

On November 29, 2010, Plaintiff saw neurosurgeon John Shiau, M.D., complaining of lower back pain that she had experienced for the previous four months. (R. 274–77.) Plaintiff filled out a pain scale report and indicated that her pain came and went and was "very severe," that she did not have to change her personal care habits in order to avoid pain, that she could not walk "at all" without increasing pain, that she avoided sitting because it immediately increased pain, that she could not stand for longer than a half-hour without experiencing pain and that her pain restricted her to "short necessary journeys under [a half-hour]." (R. 273.) Dr. Shiau noted that a November 16, 2010 magnetic resonance image ("MRI") of Plaintiff's lumbar spine showed L4-L5 degenerative disc disease with a mild disc bulge and a degenerative disc bulge at the L5-S1 disc level with a right paracentral herniated disc. (R. 276, 289.) The MRI also reflected a mild left foraminal disc protrusion at L3-L4, producing mild left neural foraminal

narrowing. (R. 289.) On examination, Dr. Shiau found that Plaintiff could not sit on the coccygeal region and was constantly fidgeting. (R. 276.) The pain near her coccyx had resulted in further mid-lower back pain that occasionally radiated into her thoracic region and her calf. (R. 276.) Dr. Shiau noted that Plaintiff's muscle tone was normal, she had full range of motion of the cervical and lumbar spines and she was alert and oriented. (R. 276.) He diagnosed her with "some type of coccydynia, perhaps related to ligamentous inflammation," and "a secondary problem of the L5-S1 herniated disc with degenerative disease." (R. 276.) Dr. Shiau gave Plaintiff a prescription for Celebrex and recommended physical therapy and, failing that, a resection of the coccyx or a microdisectomy. (R. 276.)

On April 9, 2012, Plaintiff received an MRI at Dr. Shiau's request because she was experiencing numbness and tingling in her right leg. (R. 390.) The MRI found disc desiccation at Plaintiff's L5-S1 discs, mild diffuse disc bulges at L3-L4 and L4-L5 and mild bilateral neural foraminal stenosis. (R. 390–91.)

### ii. Medical evidence after the alleged onset date

On September 21, 2011, Plaintiff was treated in the emergency room at Staten Island University Hospital for lower back pain radiating down her right leg. (R. 241–54.) She had been injured while transferring a heavy patient at work. (R. 241.) Plaintiff declined to take "sedating medication" because she was driving home and refused anti-inflammatory drugs because she could take Motrin at home. (R. 242.) On examination, Plaintiff had full range of motion in her extremities and was neurologically sound. (R. 245.) The attending physician prescribed rest, heating pads, Valium, Percoset and Ibuprofen. (R. 245.) The physician noted that Plaintiff could return to work in two days and that she should return for a follow-up evaluation and further treatment within the week. (R. 246.)

### 1. Dr. Stephen Costa

On September 22, 2011, Stephen Costa, Doctor of Chiropractic ("D.C."), examined Plaintiff for pain in her back, right buttock and right thigh. (R. 434–35.) Plaintiff had reduced lumbar range of motion and pain and spasms on palpation. (R. 436–37.) Dr. Costa restricted Plaintiff from all work-related activities and found her "totally temporarily disabled." (R. 438.) He advised that Plaintiff receive chiropractic treatments three times per week. (R. 438.) Dr. Costa also completed a form in support of Plaintiff's claim for worker's compensation benefits, noting that Plaintiff had a guarded gait, lumbar and thoracic spine muscle spasms, painful back range of motion and weakness in her right leg and thigh. (R. 331–34.) Dr. Costa's prognosis of Plaintiff was "guarded," and he noted that she had a temporary disability. (R. 333–34.) He further noted that Plaintiff was unable to lift anything greater than five pounds and advised that she avoid crouching, bending, lifting, climbing or standing for long periods of time. (R. 334.)

Dr. Costa provided Plaintiff with chiropractic care from September of 2011 through July of 2012. (R. 360–64, 374–89, 397–411, 416–33.) Plaintiff's symptoms improved slightly and then worsened again during the period of Dr. Costa's treatment. (R. 374–89.) Dr. Costa performed manual adjustments and treated Plaintiff's back with moist heat. (R. 374–80, 382, 385, 387–89, 392–93.)

On October 1, 2011, Plaintiff visited Central Broadway Medical, an independent company that performs comprehensive functional evaluations, at Dr. Costa's request and referral. (R. 397–411.) Plaintiff was administered a physical performance evaluation, which reflected Dr. Costa's diagnosis of Plaintiff's lumbar radiculopathy and lower back syndrome, both on her right side. (R. 397.) Plaintiff reported extreme restrictions in her lifestyle and, on a scale of one to ten, she indicated that her pain "interfered" at a level ten with her ability to walk one block; at a

level ten with her ability to sit for a half-hour and stand for a half-hour; at a level nine with her ability to do daily activities or jobs around the home; and at a level six with her ability to concentrate. (R. 399.) Based on the functional testing, the report assigned Plaintiff's body an "impairment value" at each source of pain. Plaintiff had pain in her right hip, knee and ankle, which rendered her eighty-seven percent impaired in her right leg and thirty-five percent impaired in her overall person. (R. 400–02.) In summary, the physical performance evaluation report indicated that based on Plaintiff's strength data in conducting various lifts, she could lift between seventeen and nineteen pounds occasionally. (R. 410.) Plaintiff was strength-deficient between fifteen and sixty-three percent on the right side of her lower body. (R. 410.) Plaintiff also had reduced range of motion in her lumbar spine. (R. 411.)

On October 7, 2011, Plaintiff received an MRI at Dr. Costa's referral. (R. 395–96.) The MRI revealed moderate to marked spinal stenosis in Plaintiff's L4-L5 discs, secondary to a herniated disc compressing the thecal sac and bilateral L5 nerve roots. (R. 396.) This was causing bilateral neuroforaminal stenosis and deformity on Plaintiff's existing L4 nerve roots. (R. 396.) The MRI also revealed a diffuse posterior bulging disc at L3-L4, affecting the nerve roots and loss of normal disc signal intensity and height. (R. 396.)

On November 19, 2011, Plaintiff underwent another physical performance evaluation of the lumbar spine. (R. 416.) Plaintiff again assessed how her pain restricted her lifestyle and, on a scale of one to ten, she reported that her pain "interfered" at a level seven with her ability to walk one block; at a level ten with her ability to sit for a half-hour and stand for a half-hour; at a level nine with her ability to do daily activities or jobs around the home; at a level seven with her ability to concentrate; and at a level seven with her ability to lift ten pounds. (R. 418.) Based on various impairment measures, Plaintiff's right leg, which included her right hip, knee and ankle,

was ninety percent impaired.  (R. 419.)  Her left leg and spine, which in October had reflected no impairments, were now impaired twenty-eight percent and twelve percent, respectively.  (R. 419.)  In total, Plaintiff's whole body was fifty percent impaired, according to the physical performance evaluation report.  (R. 419, 421.)  Plaintiff's static strength and ability to lift were re-tested, and she exhibited a nearly 100 percent decline in strength across the tested tasks.  (R. 424.)  Plaintiff was expected to be able to occasionally lift between one and six pounds.  (R. 424.)  Plaintiff's results also reflected between a twenty- and fifty-percent decrease in hip flexion and extension strength.  (R. 425–26.)

From October of 2011 through September of 2012, Dr. Costa reported on Plaintiff's workers' compensation forms that Plaintiff could not lift more than five pounds and could not crouch or bend.  (R. 336, 338, 341, 346, 349, 351, 353, 355, 357.)

### 2.  Dr. Christopher Perez

On September 26, 2011, Plaintiff visited Christopher Perez, M.D., a pain management and rehabilitation physician, for lower back and right leg pain.  (R. 503.)  Plaintiff reported back and leg pain that was exacerbated by sitting, driving, lifting, coughing and sneezing and improved by standing or lying supine.  (R. 504.)  Plaintiff ambulated without the use of an assistive device.  (R. 504.)  Dr. Perez noted that Plaintiff had no postural deficits but did have diffuse right lower paraspinal and right sciatic notch tenderness.  (R. 504.)  Examination also revealed positive straight leg raising at forty-five degrees in the right leg, forward lumbar flexion limited to thirty degrees and diffuse lower paraspinal and right sciatic notch tenderness. (R. 504.)  Dr. Perez diagnosed right lumbar radiculopathy and prescribed a course of physical therapy, Prednisone and Nucynta as needed.  (R. 504.)  He recommended an MRI and electromyography ("EMG") if Plaintiff's symptoms did not improve.  (R. 504.)  Dr. Perez also

advised Plaintiff to remain out of work for two weeks, at which time she could be re-evaluated. (R. 505.)

On October 17, 2011, Dr. Perez explained to Plaintiff that the MRI from October 6, 2011 showed herniated discs at L4-5 and L5-S1. (R. 499–500.) He recommended continued use of Nucynta and Neurontin and recommended an EMG to further evaluate her symptoms. (R. 499–500.) Dr. Perez also advised Plaintiff to remain out of work for the following four weeks, until she could be re-evaluated. (R. 500, 502.) Plaintiff presented for a lower extremity EMG on November 7, 2011. (R. 495–98.) Dr. Perez administered the EMG, which revealed "abnormal" findings consistent with a right L5 radiculopathy. (R. 498.) Based on the results of the EMG, Dr. Perez advised Plaintiff to continue physical therapy and schedule lumbar epidural steroid injections and a pain management consultation. (R. 498.) Plaintiff returned to Dr. Perez on November 21, 2011, complaining of continued lower back and right leg pain exacerbated by sitting, driving, bending, coughing and sneezing. (R. 493–94.) Dr. Perez prescribed Vicodin as needed and scheduled Plaintiff for an epidural steroid injection.[2] (R. 493–94.)

On December 19, 2011, Plaintiff returned to Dr. Perez with continued complaints of lower back and right leg pain. (R. 491–92.) Plaintiff reported no relief from her two recent epidural steroid injections and, in fact, felt worse from the procedures. (R. 491.) Dr. Perez advised her to stay out of work for four weeks and referred her to Dr. Shiau for a neurosurgical consultation. (R. 492.) On January 17, 2012, Plaintiff informed Dr. Perez that Dr. Shiau

---

[2] On December 1, 2011, Plaintiff presented to Kenneth Chapman, M.D., for her lower back and sciatic leg pain. (R. 256, 328.) Plaintiff described her lower back pain as "sharp and shooting" and rated it as a six on a scale of one-to-ten, on average, and as a nine at worst. (R. 256.) Dr. Chapman diagnosed Plaintiff with lumbar disc disorder and lumbar radiculopathy. (R. 256.) On December 3, 2011, Dr. Chapman administered two transforaminal epidural injections into Plaintiff's lumbar spine. (R. 258, 329–30.)

recommended a microdisectomy and fusion surgery of her lumbar spine. (R. 489–90.) Dr. Perez recommended that she seek a second opinion from a spine surgeon. (R. 490.)

From February of 2012 through August of 2012, Dr. Perez treated Plaintiff for pain in her lower back, right thigh and right leg. (R. 465, 472, 475, 480, 482, 487, 491, 493.) Plaintiff consistently reported that physical therapy, chiropractic treatment and acupuncture afforded her only minimal improvement, and that she continued to take Vicodin, Neurontin and Motrin. (R. 465, 472, 475, 480, 482, 487, 491, 493.) Her examinations consistently revealed diffuse lower paraspinal and right sciatic notch tenderness, reduced lumbar range of motion and full right hip range of motion. (R. 470, 473, 476, 479, 481, 483, 485, 488, 490, 492, 494, 506.) Plaintiff consistently reported having difficulty sleeping at night and reported the same radiating and tingling sensations through her back, thigh and down to her foot. (R. 470, 473, 476, 479, 481, 483, 485, 488, 490, 492, 494, 506.) Dr. Perez's impressions remained the same throughout this period, and he diagnosed Plaintiff with "right lumbar radiculopathy-L5 level" and lumbosacral disc herniation. (R. 470, 473, 476, 479, 481, 483, 485, 488, 490, 492, 494, 506.) He continued to advise Plaintiff to remain out of work during this time because she maintained a "total 100% disability from her occupation" and could not sit for more than fifteen-to-twenty minutes at a time. (R. 471, 474, 476, 479, 481, 483, 485, 488, 490, 492, 494, 506.)

An April 9, 2012, an MRI of Plaintiff's lumbar spine revealed multilevel disc bulges at discs L3-L4, L4-L5 and more severe bulges at L5-S1, desiccation and mild bilateral foraminal stenosis. (R. 390–91.) Dr. Perez examined Plaintiff after the MRI and noted that Plaintiff was treating her pain with Motrin, Vicodin and Neurontin, and that Dr. Shiau had recommended both a discectomy and a fusion. (R. 480.) Dr. Perez also advised Plaintiff not to sit for more than fifteen or twenty consecutive minutes and to avoid lifting and bending. (R. 481.) Between April

and June of 2012, Dr. Perez maintained this diagnosis and recommendation, advising against bending, lifting or sitting for longer than twenty minutes. (R. 475–83.) He also encouraged Plaintiff to continue regular chiropractic and physical therapy treatments. (R. 475–83.)

In July of 2012, Plaintiff returned to see Dr. Perez, having obtained a second opinion regarding her need for surgery. (R. 472.) Dr. Perez noted that Plaintiff had seen Dr. James Farmer, a spine surgeon, twice, and Dr. Farmer had concluded that surgery would not alleviate Plaintiff's pain. (R. 472.) Dr. Perez continued to note that Plaintiff had experienced only minimal improvement from her therapy, chiropractic and acupuncture treatments. (R. 472.) Given Plaintiff's failed response to conservative treatment and having been told she was not a good candidate for surgery, Dr. Perez recommended Calmare scrambler therapy for symptomatic relief of Plaintiff's radicular lower back and leg pain. (R. 470–71, 473–74.) Plaintiff and Dr. Perez then waited for workers' compensation to authorize scrambler therapy. (R. 468.)

On September 6, 2012, Plaintiff underwent an MRI of her pelvis, which returned "unremarkable" results. (R. 520.) Dr. Perez advised that she undergo an MRI of her right hip, but Plaintiff's workers' compensation denied the authorization. (R. 520.)

Workers' compensation records indicate that Dr. Perez continued to treat Plaintiff through May of 2013. (R. 516, 531–55.) Plaintiff added Tramadol and Butrans patches to her pain relief medications sometime in the fall of 2012, when her insurance declined to re-authorize her chiropractic treatments and physical therapy and she discontinued those courses of treatment. (R. 520.) As of January 14, 2013, Dr. Perez noted that Plaintiff was unable to sleep for more than three hours per night and could not sit for longer than ten-to-fifteen minutes, bend, or lift more than five-to-ten pounds. (R. 521.) She also could not stand or walk for longer than ten-to-

fifteen minutes.  (R. 521.)  In early 2013, Plaintiff's insurance had not yet approved the proposed Calmare scrambler therapy to treat Plaintiff's pain.  (R. 521.)

According to workers' compensation forms, Dr. Perez administered scrambler therapy to Plaintiff on July 3, 2013, September 6, 2013, October 4, 2013, November 4, 2013, November 8, 2013, November 18, 2013, December 4, 2013 and January 8, 2014.  (R. 557–64, 569–72, 576–79, 584–608.)  Throughout this period, Dr. Perez indicated that Plaintiff was seventy-five percent physically impaired.  (R. 533, 552, 554, 558, 563, 571, 578, 586, 590, 594, 598, 602, 606.)

On August 12, 2013, Dr. Perez completed a medical source statement.  (R. 635–38.)  He noted that he had treated Plaintiff since September of 2011 for lumbar disc herniation and lumbar radiculopathy.  (R. 635.)  Dr. Perez considered Plaintiff's prognosis "poor."  (R. 635.)  Her symptoms included lower back pain, right thigh pain and leg pain with leg numbness exacerbated by sitting, bending and lifting.  (R. 635.)  Plaintiff reported a shooting, burning pain in the lower back to the buttock, thigh and calf.  (R. 635.)  She showed a reduced lumbar range of motion, a positive straight-leg test on the right side and an abnormal gait.  (R. 636.)  Plaintiff became dizzy and drowsy throughout the day because of her pain medication.  (R. 636.)  Dr. Perez opined that Plaintiff could sit for fewer than two hours in an eight-hour work day and could stand or walk for fewer than two hours in an eight-hour work day.  (R. 646.)  He also indicated that Plaintiff could sit for ten minutes before needing to stand or shift positions and could stand for ten minutes before needing to sit or change positions.  (R. 646.)  Dr. Perez opined that Plaintiff could occasionally lift and carry less than ten pounds and could never carry more than ten pounds.  (R. 637.)  Plaintiff could rarely twist and stoop and could never crouch, squat, or climb ladders or stairs.  (R. 637.)  Dr. Perez also opined that Plaintiff was capable of moderate work stress and likely would be absent from work more than four days per month as a result of

her impairment. (R. 638.) Dr. Perez estimated that Plaintiff's pain would interfere with approximately twenty-five percent of her time at work. (R. 638.)

On November 4, 2013, Dr. Perez completed a workers' compensation form in which he stated that Plaintiff had reached her maximum medical improvement and was unable to work. (R. 526.) Dr. Perez indicated that Plaintiff could "never" climb, kneel, bend, stoop, squat, or operate machinery; that Plaintiff could "occasionally"[3] lift, carry, push and pull up to ten pounds and drive a car; and that Plaintiff could "constantly" perform simple grasping activities and fine manipulations, reach overhead or at shoulder level and operate machinery. (R. 527.) He further checked a box indicating that Plaintiff was "unable to meet the requirements of sedentary work." (R. 527.)

On February 14, 2014, Plaintiff returned to Dr. Perez for a follow-up consultation. (R. 203–05.) Dr. Perez described Plaintiff's course of physical therapy, chiropractic treatment, lumbar epidural steroid injections and Calmare scrambler therapy. (R. 203.) Plaintiff continued to complain of lower back pain that radiated down her posterior right thigh, extending to her right lateral calf and into her right foot with numbness, tingling and shock-like sensations. (R. 203.) She also described radiating pain in her buttocks and weakness in her right thigh and calf. (R. 203.) Dr. Perez noted that Plaintiff reported having a hard time sleeping because of her pain, despite using Flexeril and Klonopin at bedtime. (R. 203.) Plaintiff could not sit or stand for longer than ten-to-fifteen minutes each, lift more than five-to-ten pounds, or bend. (R. 203.) Dr. Perez indicated that Plaintiff was referred to a psychiatrist for her depressed mood, resulting from her chronic pain and inability to work. (R. 203.) Dr. Perez wrote that his plan was for

---

[3] The term "occasionally" is defined as "up to 1/3 of the time," "frequently" is defined as "1/3 to 2/3 of the time," and "constantly" is defined as "more than 2/3 of the time." (R. 527.)

Plaintiff to continue taking long-acting opioids and see an interventional pain management specialist for a spinal cord stimulator. (R. 204.) He noted that Plaintiff had applied for social security disability benefits and was "permanently unable to maintain any type of gainful employment." (R. 204.)

On June 24, 2014, Plaintiff returned to Dr. Perez for a follow-up evaluation. (R. 651.) Plaintiff reported no improvement of her radicular pain and was still equally limited in her ability to sit, stand, walk, lift and bend. (R. 651.) She had developed a partial right foot drop with gait dysfunction, and she walked with a cane. (R. 652.) Dr. Perez reviewed and changed Plaintiff's medications to remedy her side effects. (R. 653.) Dr. Perez noted that he had ordered a carbon-fiber ankle and foot orthosis for Plaintiff's gait dysfunction, and he advised Plaintiff to follow-up with further psychiatric care. (R. 653.)

### 3. Dr. Frank Segreto

On December 13, 2011, Frank Segreto, M.D., conducted an independent medical examination of Plaintiff for the workers' compensation board. (R. 306–10.) Plaintiff described her injury and her treatment with Drs. Costa and Perez. (R. 307.) She reported that she could walk one block and sit for fifteen minutes at a time and that she was unable to perform childcare duties without assistance. (R. 307.) Plaintiff reported that she was unable to perform errands, but she could care for her personal needs. (R. 307.) Dr. Segreto's examination revealed that Plaintiff ambulated with a limp but without the use of an assistive device. (R. 308.) She wore a lumbar corset. (R. 308.) Dr. Segreto examined Plaintiff's October of 2011 MRI and various reports from her doctors. (R. 307.) Dr. Segreto diagnosed Plaintiff with lumbar spine strain with herniated nucleus pulposus and right-sided radiculopathy. (R. 308.) He opined that Plaintiff had a temporary marked orthopedic disability and could perform only sedentary work. (R. 309.) Dr.

Segreto recommended a spinal fusion followed by postoperative physical therapy and an orthopedic reevaluation. (R. 309.)

Dr. Segreto examined Plaintiff again on July 10, 2012, for the workers' compensation board. (R. 311–13.) He noted that Plaintiff had not undergone surgery and that her pain management treatments had proven ineffective. (R. 311.) Dr. Segreto conducted a physical examination and noted that Plaintiff had a reduced range of motion on flexion and extension and paravertebral tenderness and muscle spasms on palpation. (R. 313.) He again recommended that Plaintiff undergo spinal fusion, asserting that she had received "the maximum amount of treatment inclusive physical therapy and pain management treatment and has not made objective gains." (R. 314.) Dr. Segreto also expressed his belief that there was a direct correlation between Plaintiff's complaints and her workplace injury. (R. 314.)

### 4. Dr. John Shiau

At Dr. Perez's recommendation, Plaintiff presented to Dr. Shiau in January and February of 2012. (R. 266–67.) On January 16, 2012, Dr. Shiau noted, in a letter to Dr. Perez, that he had reviewed Plaintiff's most recent MRI, which reflected a degenerated disc at L4-L5 with biforaminal narrowing and moderate to severe stenosis. (R. 267.) Dr. Shiau disagreed with the radiology report, writing that in his view, Plaintiff exhibited "a very mild stenosis." (R. 267.) On physical examination, Dr. Shiau found that Plaintiff had decreased range of motion in the lumbar spine, especially on extension. (R. 267.) He found tenderness to palpation in Plaintiff's paraspinal region and found her alert and oriented. (R. 267.) Her motor exam was normal, although she lost balance easily. (R. 267.) Dr. Shiau reviewed the MRI with Plaintiff and explained that she had "two different issues going on in terms of her lumbar spine." (R. 267.) She had lower back pain, which Dr. Shiau attributed to mild degeneration of L4-L5 discs and

severe degeneration of L5-S1 discs. (R. 267.) She also experienced radiculopathy down her right leg, attributable to the L5-S1 level disc. (R. 267.) Dr. Shiau indicated that Plaintiff was disabled at that time. (R. 267.)

On February 6, 2012, Dr. Shiau examined Plaintiff during a neurosurgical follow-up. (R. 266.) In a letter to Dr. Perez, Dr. Shiau explained that Plaintiff's MRI showed "significant" disc herniation at L5-S1 "with involvement of the nerve roots." (R. 266.) The MRI reported severe-to-moderate compression of Plaintiff's L4-L5 discs, but Dr. Shiau identified it as mild-to-moderate compression and stenosis. (R. 266.) Plaintiff reported back pain nearly as severe as her leg pain, but she was not eager to have a spinal fusion performed. (R. 266.) Dr. Shiau instead recommended that he decompress the L4-L5 level using a minimally invasive technique and then perform a discectomy and laminectomy at L5-S1. (R. 266.) He also recommended that Plaintiff obtain an updated lumbar MRI because her pain had worsened since her last MRI. (R. 266.) Dr. Shiau noted his hope that decompression of Plaintiff's nerve roots would resolve the radiculopathy and back pain, but advised that if her back pain continued to be debilitating after a discectomy then she would have to consider a minimally invasive fusion. (R. 266.) Dr. Shiau stated that Plaintiff remained moderately disabled and would remain out of work until a definitive surgical intervention was performed. (R. 266.)

### 5.  Dr. James Farmer

On May 29, 2012, Plaintiff was examined by James Farmer, M.D., an orthopedic surgeon, for a second opinion on her options for surgery. (R. 317.) His examination revealed that Plaintiff had tenderness to palpation in her lower lumbar spine. (R. 317.) She was able to flex forward only minimally because of her right leg pain and able to extend only thirty degrees. (R. 318.) She experienced increasing pain with extension and lateral bending. (R. 318.)

Plaintiff had full motor strength in her lower extremities except for the right extensor halluces longus and tibialis.  (R. 318.)  Dr. Farmer examined Plaintiff's April of 2012 MRI and noted that he was unable to explain Plaintiff's right leg symptoms based on the MRI.  He recommended a neurology evaluation with Dr. Carl Heise and discussed the possibility of Plaintiff undergoing a discography and possibly a surgical fusion.  (R. 318.)

On June 28, 2012, Plaintiff returned to Dr. Farmer and reported no change in her symptoms.  (R. 316.)  Plaintiff had seen Dr. Heise, "who agreed that he could not explain her symptoms based on the MRI findings."  (R. 316.)  Dr. Farmer's examination revealed lumbar tenderness on the left and the same physical findings as Plaintiff's prior examination.  (R. 316.)  Dr. Farmer told Plaintiff he could not explain her symptoms and did not see any surgically amenable lesions.  (R. 316.)  He recommended that Plaintiff seek pain management and use a spinal cord stimulator.  (R. 316.)

### 6.  Dr. Kevin Portnoy

On July 19, 2012, chiropractor Kevin Portnoy, D.C., examined Plaintiff at the request of her workers' compensation insurance carrier.  (R. 366–69.)  In a letter "to whom it may concern," Dr. Portnoy explained that Plaintiff reported her pain was at a nine on a scale of one-to-ten and that she felt worse after ten months of continuous chiropractic care.  (R. 367.)  Plaintiff was wearing a lumbar support and was able to get on and off the examining table unaided.  (R. 367.)  Plaintiff lacked full flexion, extension and rotation.  (R. 367.)  Dr. Portnoy noted no tenderness to palpation or evidence of muscle spasms, and he assessed Plaintiff to have perfect lower extremity muscle strength.  (R. 367.)  Dr. Portnoy concluded that Plaintiff sustained a "temporary mild partial disability" and was capable of performing her normal daily activities with no restrictions.  (R. 368.)  He advised Plaintiff not to lift more than thirty pounds

and noted that Plaintiff "should be advised ergonomically as to bending, lifting, pushing, pulling, reaching and stopping." (R. 368.) Dr. Portnoy opined that Plaintiff had achieved maximum benefit from an active course of chiropractic therapy and that any further chiropractic care would be considered excessive. (R. 368.)

### 7. Dr. Ilana Reich

On May 20, 2013, Plaintiff began seeing Ilana Reich, Ph.D., to treat her anxiety and depression. (R. 574; *see* R. 210–11.) Plaintiff saw Dr. Reich weekly or biweekly. (*See* R. 210–211.) Dr. Reich reported that Plaintiff was referred by Dr. Perez, who identified Plaintiff's psychological symptoms. (R. 574.) Dr. Reich noted that Plaintiff had not reached her maximum medical improvement because she was awaiting the implantation of a spine stimulator. (R. 574.) Dr. Reich wrote that Plaintiff was angry and frustrated by her limitations and struggled to find meaning in her daily life. (R. 574.) She slept poorly and was in continuing pain. (R. 574.) Dr. Reich opined that Plaintiff was permanently impaired and could not function without the antidepressant she was receiving from Dr. Conciatori-Vaglica. (R. 574.)

On February 25, 2014, Dr. Reich wrote a psychological report in which she diagnosed Plaintiff with anxiety-related disorders and affective disorder. (R. 206–209.) Dr. Reich assessed a global assessment of function ("GAF") score of 55.[4] (R. 206.) Plaintiff reported increased arguments with family members, feelings of isolation and withdrawal, hopelessness,

---

[4]  The GAF score is a numeric scale ranging from "0" (lowest functioning) through "100" (highest functioning). "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, at 32 (4th ed. 2000)). "A GAF between 51 and 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *Id.* (quoting *Diagnostic and Statistical Manual of Mental Disorders*, at 34.).

worthlessness and low self-esteem. (R. 206–07.) Plaintiff reported that her pain interfered with activities of daily living, such as putting on socks or taking a shower. (R. 207.) On examination, Plaintiff was well oriented. (R. 207–08.) Her memory for recent events was severely impaired. (R. 207.) Her motor behavior was abnormal and her gait was disturbed. (R. 207.) She used a cane to walk. (R. 207.) Plaintiff's mood was depressed, irritable and anxious. (R. 207.) Dr. Reich opined that Plaintiff's activities of daily living were moderately restricted and that she had severe difficulty in maintaining social functioning, concentrating and completing tasks in a timely manner. (R. 208.) Dr. Reich also noted that Plaintiff had severe episodes of deterioration or decompensation. (R. 208.) Dr. Reich concluded that Plaintiff showed "no resistance to treatment" and seemed fairly motivated to continue. (R. 209.) She further noted that Plaintiff was "able to use insight and to express her feelings directly and appropriately," and that Plaintiff had responded to treatment slowly but positively. (R. 209.)

### 8. Dr. Christina Conciatori-Vaglica

On July 5, 2013, Plaintiff saw psychiatrist Christina Conciatori-Vaglica, D.O., with complaints of anxiety and worry about supporting her family. (R. 210–12.) Plaintiff explained that she felt useless and not connected to her children because of depression. (R. 210.) She was unable to pick up her children because of her pain and could not perform household chores or drive for more than fifteen minutes at a time. (R. 210.) Plaintiff complained of difficulty focusing in conversation and reported anhedonia, helplessness, social isolation, crying spells on a daily basis and passive suicidal ideation. (R. 210.) She needed help to put on her shoes and to get into and out of the shower. (R. 210.) Dr. Conciatori-Vaglica noted that Plaintiff was seeing Dr. Reich once per week at the suggestion of her physician. (R. 210.) She recommended that

Plaintiff continue treatment with Dr. Reich and begin treating her anxiety and depression with Celexa. (R. 211.)

### 9. Dr. Malcolm Brahms

On March 17, 2014, Malcolm Brahms, M.D., an independent medical expert, completed a medical source statement on Plaintiff's ability to do physical work-related activities. (R. 641–50.) Dr. Brahms completed the source statement in response to interrogatories from the ALJ and appears to have reviewed Plaintiff's file, although there is no indication of what materials he reviewed. Dr. Brahms opined that Plaintiff could "frequently" lift up to twenty pounds and "never" lift anything above twenty pounds. (R. 641.) He opined that Plaintiff could "frequently" carry up to ten pounds, "occasionally" carry up to twenty pounds and "never" carry anything above twenty pounds. (R. 641.) Dr. Brahms further opined that Plaintiff could sit for three hours without interruption, could stand for two hours without interruption and could walk for one hour without interruption. (R. 642.) He indicated that, in an eight-hour work day, Plaintiff could sit for six hours, stand for four hours and walk for two hours. (R. 642.) He noted that Plaintiff ambulated without a cane and that she could use her hands "frequently" for reaching, "continuously" for handling and feeling and "occasionally" for pushing and pulling. (R. 643.) Dr. Brahms opined that Plaintiff could "occasionally" climb stairs and ramps, balance, stoop and kneel but could "never" climb ladders, crouch or crawl. (R. 644.) He wrote that Plaintiff could "never" be exposed to unprotected heights or moving mechanical parts. (R. 645.) Dr. Brahms indicated that Plaintiff could shop, travel without a companion for assistance, ambulate without a wheelchair, two canes or two crutches, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace, prepare a simple meal, care for personal hygiene and sort, handle, or use paper files. (R. 646.) Dr. Brahms

also opined that Plaintiff's impairments did not meet or equal any of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 648.) Dr. Brahms opined that Plaintiff could perform a range of light work. (R. 649.)

### iii. Medical evidence submitted to Appeals Council

In appealing the ALJ's decision to the Appeals Council, Plaintiff submitted treatment notes from her sessions with Dr. Conciatori-Vaglica between April of 2014 and July of 2014. On April 25, 2014, Dr. Conciatori-Vaglica treated Plaintiff for depression, anxiety, social isolation and irritability. (R. 661–63.) Dr. Conciatori-Vaglica noted that although Plaintiff had attempted to contact her since their last appointment in July of 2013, she was unable to "get through." (R. 662.) Plaintiff had discontinued the Celexa because it was producing skin rashes. (R. 662.) Plaintiff reported that she had continued to see Dr. Reich every two weeks and was taking Klonopin for insomnia. (R. 662.) Her pain was still significant. (R. 662.) Plaintiff reported feeling isolated from her husband and children and feeling useless because she was unable to grocery shop or tend to household chores. (R. 662.) Plaintiff also reported passive suicidal ideations. (R. 662.) Dr. Conciatori-Vaglica noted that Plaintiff appeared calm and cooperative and that her mood was anxious and sad. (R. 662.) Her recent memory was intact and she was lucid and not evincing illogical or irrational thought processes. (R. 662.) Dr. Conciatori-Vaglica diagnosed Plaintiff with major depressive disorder that had worsened since her last visit and recommended different medication for anxiety and depression. (R. 663.)

On May 23, 2014, Plaintiff told Dr. Conciatori-Vaglica that she was unable to grocery shop, attend to household chores or play with her children because she was depressed. (R. 665.) An examination revealed that Plaintiff was fully oriented, cooperative and calm. (R. 665.) Plaintiff had coherent speech, intact insight and judgment, intact attention and concentration and

intact memory. (R. 665.) She had no auditory hallucinations or illogical thoughts, but she was sad and anxious. (R. 665.) Dr. Conciatori-Vaglica changed Plaintiff's medication. (R. 665.)

On June 27, 2014, Plaintiff told Dr. Conciatori-Vaglica that she had been considering suicide but that her husband had convinced her otherwise. (R. 667.) Dr. Conciatori-Vaglica reported that Plaintiff's symptoms were unchanged from her last visit, she recommended that Plaintiff discontinue some of her prior medications and continue other medications for depression. (R. 668.)

On July 2, 2014, Dr. Conciatori-Vaglica completed a medical source statement in which she opined that Plaintiff experienced marked limitations in the ability to understand, remember and carry out simple instructions and make judgments on simple work-related decisions. (R. 655.) In addition, Dr. Conciatori-Vaglica opined that Plaintiff experienced marked limitations in her ability to interact appropriately with the public, with supervisors and with co-workers. (R. 656.) She wrote on a corner of the page that Plaintiff had a "total permanent psychiatric disability." (R. 656.)

### d. Additional evidence

In a function report dated October 9, 2012, Plaintiff explained that her mother and husband helped bathe and prepare meals for her children because she could not sit or stand long enough to perform household chores. (R. 183–84.) Plaintiff could not sleep because she had difficulty lying flat, and she needed help to enter and exit the shower and to get on and off the toilet. (R. 184.) On "good days" she was able to sweep or vacuum, but needed help to plug in the vacuum. (R. 185.) She was constantly changing positions and needed to alternate between standing and sitting throughout the day. (R. 192.) Plaintiff was able to drive a short distance, pay bills and handle a savings account. (R. 186.) She explained that she no longer engaged in

her previous hobbies — skiing, playing softball and bicycling — but did attend church on Sundays. (R. 186.) Plaintiff could not lift objects and could sit, stand or walk for fifteen minutes at a time. (R. 188.) Plaintiff used a back brace and a cane. (R. 188.)

### e. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the SSA.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 20, 2011, the date of Plaintiff's workplace injury. (R. 29.) At step two, the ALJ found that Plaintiff had a severe back disorder impairment. (R. 29.) Also at step two, the ALJ considered Plaintiff's mental health treatment and determined that Plaintiff had no more than a "mild" mental impairment, based on four broad functional areas set out in the disability regulations.[5] (R. 30.) In reaching this conclusion, the ALJ assigned "little weight" to the medical source statement and GAF assessment of Dr. Reich, reasoning that Dr. Reich's conclusions were inconsistent with Plaintiff's lack of mental health treatment and with Plaintiff's own statements regarding her mental health. (R. 30.) At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets, or is equal to, the severity of any of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 66.)

At step four, the ALJ found that Plaintiff has the RFC to perform "light work" as defined in 20 CFR 404.1567(b). (R. 31.) The ALJ found that Plaintiff can lift and/or carry up to twenty pounds occasionally and lift up to ten pounds frequently. (R. 31.) He found that Plaintiff can

---

[5] Specifically, the ALJ considered Plaintiff's limitations in (1) daily living, (2) social functioning, (3) concentration, persistence or pace and (4) episodes of decompensation. (R. 30–31.)

stand and/or walk for approximately six hours per work day and sit for approximately six hours per work day, with normal breaks. (R. 31.) He also found that Plaintiff can never climb ladders, ropes or scaffolds but can occasionally climb ramps or stairs and balance, stoop, crouch, kneel or crawl. (R. 31.) In reaching this conclusion, the ALJ reviewed the medical evidence and Plaintiff's testimony and determined that although Plaintiff's impairments "could reasonably be expected to cause some of the alleged symptoms," her statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 32.) The ALJ stated that although early MRIs of Plaintiff's spine documented a "very serious condition, physicians actively disagreed with the interpretation of this study."[6] (R. 32.) Consistent with those physicians' sentiments, Plaintiff's updated MRI in 2012 showed "only a mild to moderate back disorder." (R. 32.) The ALJ noted that Dr. Farmer had concluded that Plaintiff was not a surgical candidate and that the record reflected only conservative treatment. (R. 32.) The ALJ found particularly persuasive the absence of "significant signs of stenosis or nerve root compromise" and "sensory deficits, motor defects, or difficulties ambulating." (R. 32, 33, 34.) The ALJ repeatedly noted that Plaintiff underwent a conservative course of treatment and was able to care for her children, drive and attend church. (R. 32, 33, 34.)

The ALJ noted that the case file lacked significant treating source evidence from 2013 and 2014. (R. 33.) However, he observed that Plaintiff continually maintained good motor strength and intact sensation and did not require surgery. (R. 33.) The ALJ determined that Plaintiff's complaints of lower back pain with radiculopathy were "not well supported by objective evidence or physical examination results." (R. 33.) In particular, he found persuasive that Plaintiff's physical examinations were unremarkable, that she did not have difficulty

---

[6] The ALJ did not identify the physicians by name.

ambulating and that the more recent MRIs were milder than her older ones. (R. 33.) In assessing the opinion evidence, the ALJ assigned "little weight" to the doctors' opinions regarding Plaintiff's level of disability because the opinions were vague with respect to specific functional restrictions and inconsistent with the medical evidence of record and Plaintiff's "conservative course of treatment and activities of daily living." (R. 34.) The ALJ assigned "little weight" to Dr. Perez's medical source statement dated August 12, 2013, finding it was not supported by substantial evidence because "updated studies of the [Plaintiff's] spine fail to show any significant signs of stenosis or nerve root compromise" and because Plaintiff had "not consistently displayed any sensory deficits, motor defects, or difficulties ambulating." (R. 34.) In addition, the ALJ found Dr. Perez's statement inconsistent with Plaintiff's conservative course of treatment and her activities of daily living. (R. 34.) For "the same reasons," the ALJ afforded "little weight" to Dr. Segreto's opinion that Plaintiff was limited to performing sedentary work. (R. 34.)

The ALJ assigned "some weight" to Dr. Portnoy's opinion that Plaintiff was capable of performing her normal activities with no restrictions because that opinion was consistent with "updated studies of the [Plaintiff's] spine," which "fail to show any significant signs of stenosis or nerve root compromise" and with the absence of any "sensory deficits, motor defects, or difficulties ambulating." (R. 34.) However, since Dr. Portnoy had not provided a detailed, function-by-function assessment of Plaintiff's ability to perform work-related tasks, the ALJ decided not to assign his opinion greater weight. (R. 34.)

The ALJ assigned "great weight" to Dr. Brahms' opinion that Plaintiff could perform "the functional range of light work with manipulative, postural, and environmental restrictions," except that the ALJ declined to adopt any manipulative or environmental restrictions in making

the RFC assessment. (R. 35.) The ALJ stated that Dr. Brahms' opinion was "well supported by the objective diagnostic studies of [Plaintiff's] lumbar spine, which only document disc bulges with nerve root abutment." (R. 35.) However, the ALJ also wrote that Dr. Brahms' conclusion was "*inconsistent* with the medical evidence of record, which fails to document any significant signs of nerve root compromise, gait abnormalities, or sensory deficits," and was also inconsistent with Plaintiff's conservative course of treatment and activities of daily living. (R. 35 (emphasis added).)

Finally, the ALJ determined that Plaintiff was not capable of performing her past relevant work as a personal care aide, but concluded that based on Plaintiff's age, education, work experience and RFC, "there are jobs that exist in significant numbers in the national economy" that Plaintiff can perform, including as a cashier, a mail clerk, or as a personal attendant. (R. 36.) The ALJ therefore determined that since September 20, 2011, Plaintiff had not been suffering from a "disability" as this term is defined under the SSA. (R. 36.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court

"can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the SSA. To be considered disabled under the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

Plaintiff moves for judgment on the pleadings, arguing that the ALJ erred by (1) improperly weighing the medical opinion evidence and (2) failing to consider Plaintiff's reports of pain and pain medications in assessing her RFC. (Pl. Mem. 1.) The Commissioner

cross-moves for judgment on the pleadings, arguing that the ALJ's decision is supported by substantial evidence and should be affirmed. (Comm'r Mem. 1, Docket Entry No. 17.)

### i. The ALJ improperly weighed the medical evidence

Plaintiff argues that the ALJ violated the treating physician rule by discounting Dr. Perez's opinion of Plaintiff's functional abilities and choosing instead to rely on the opinions of Dr. Portnoy and Dr. Brahms. (Pl. Mem. 20–22.) Plaintiff argues that even if Dr. Brahms' opinion merited great weight, it does not support the ALJ's finding that Plaintiff can perform "light work." (*Id.* at 22.) Plaintiff also argues that the ALJ violated the treating physician rule by substituting his own lay opinion for the opinions of Plaintiff's treating psychiatrists, Dr. Conciatori-Vaglica and Dr. Reich. (*Id.* at 24–25.) The Commissioner argues that the ALJ properly weighed Dr. Perez's opinion because it was inconsistent with "the objective medical findings of record" and with Plaintiff's report of her normal daily activities. (Comm'r Mem. 21– 22.) Similarly, the Commissioner argues that the ALJ did not err in finding Dr. Reich's opinion unsupported by the record because Dr. Reich's simply "repeat[ed] Plaintiff's own subjective and self-serving statements about her anxiety." (*Id.* at 23.)

### 1. Treating physician rule and duty to develop the record

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the plaintiff's] case record."[7]  20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

An ALJ must consider a number of factors to determine how much weight to assign to a treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors).  The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion.  *Halloran*, 362 F.3d at 32.  While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken.  *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)).  Failure "to provide good reasons for not crediting the opinion of a claimant's

---

[7]  A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]."  20 C.F.R. § 404.1502; *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

In addition, although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act, . . . 'because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.'" *Burgess*, 537 F.3d at 128 (alteration omitted) (first citing *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002); and then quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" (quoting *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))).  Pursuant to the ALJ's duty to develop the record, the ALJ must attempt to fill gaps in the record.  *See Rosa v. Callahan*, 168 F.3d 72, 79 & n.5 (2d Cir. 1999) (explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information); 20 C.F.R. § 416.912(d)(2) (requiring the ALJ to develop claimant's complete medical history).  This duty is present "[e]ven when a claimant is represented by counsel." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (collecting cases); *see also Rockwood v. Astrue*, 614 F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record, even if the claimant is represented by counsel, if the medical record is ambiguous or incomplete." (first citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); and then citing *Rosa*, 168 F.3d at 79)).

## A. Dr. Perez

In his August 12, 2013 medical source statement, Dr. Perez opined that Plaintiff's prognosis was "poor." (R. 635.) He noted that Plaintiff's symptoms included lower back pain, right thigh pain and leg pain with leg numbness exacerbated by sitting, bending and lifting. (R. 635.) He also noted that Plaintiff reported a shooting, burning pain from the lower back to the buttock, thigh and calf. (R. 635.) After conducting a physical examination of Plaintiff, Dr. Perez reported that Plaintiff showed a reduced lumbar range of motion, a positive straight-leg test on the right side and an abnormal gait. (R. 636.) He also noted that Plaintiff reported becoming dizzy and drowsy throughout the day because of her pain medication. (R. 636.) Dr. Perez opined that Plaintiff could sit for fewer than two hours in an eight-hour work day and stand or walk for fewer than two hours in an eight-hour work day. (R. 646.) He also indicated that Plaintiff could sit for ten minutes before needing to stand or shift positions and could stand for ten minutes before needing to sit or change positions. (R. 646.) Dr. Perez opined that Plaintiff could occasionally lift and carry less than ten pounds and could never carry more than ten pounds. (R. 637.) Plaintiff could rarely twist and stoop and could never crouch, squat, or climb ladders or stairs. (R. 637.) Dr. Perez also opined that Plaintiff was capable of moderate work stress and likely would be absent more than four days per month as a result of her impairment. (R. 638.) Dr. Perez estimated that Plaintiff's pain would interfere with approximately twenty-five percent of her time at work. (R. 638.)

The ALJ did not adequately explain his reasons for according "little weight" to Dr. Perez's medical opinion of Plaintiff's functional abilities. (R. 34.) The ALJ explained that he chose to discount Dr. Perez's opinion because that opinion, despite being "detailed," was "no[t] supported by substantial evidence." (R. 34.) The ALJ reasoned:

On the contrary, updated studies of the claimant's spine fail to show any significant signs of stenosis or nerve root compromise. Similarly, the claimant has not consistently displayed any sensory deficits, motor defects, or difficulties ambulating. [Dr. Perez's] opinion is also inconsistent with the claimant's conservative course of treatment and her activities of daily living, which include caring for her children, driving, and attending church.

(R. 34.) This is insufficient to meet the dictates of the treating-physician rule. If Dr. Perez's opinion was supported by acceptable laboratory and clinical diagnostic techniques, his opinion is entitled to controlling weight if it does not conflict with the other substantial evidence in Plaintiff's record. *See Lesterhuis*, 805 F.3d at 88.

Dr. Perez stated that his opinions were based on clinical and diagnostic abnormalities, including several MRIs of Plaintiff's lumbar spine; treatment notes from other physicians and a physical performance report issued by an independent lab, (R. 418–21); limited motion in Plaintiff's lumbar flexion and extension; diffuse tenderness in her lumbar spine; consistent positive straight-leg tests and an abnormal gait. (R. 635–36.) The ALJ does not appear to have considered this information and instead interpreted Plaintiff's MRIs and clinical findings differently based on his own understanding of the medical evidence. (R. 32, 33.) Indeed, the ALJ compared the decisions of each physician whose opinion he weighed to his own assessment of the evidence, using the same summary of the evidence he found most relevant to Plaintiff's RFC. The ALJ arrived at his assessment of Plaintiff's condition — that there were "no significant signs of stenosis or nerve root compromise" and "no consistent signs of sensory deficits, motor defects, or difficulties ambulating,"[8] (R. 32, 33, 34) — by noting that "although

---

[8] The ALJ's conclusion placed him at significant odds with the opinions of Dr. Costa, Dr. Perez, Dr. Shiau and Dr. Segreto, all of whose opinions he determined to be "vague" despite later describing Dr. Perez's opinion as "detailed." (R. 34.) In addition, only a single physician, Dr. Shiau, disagreed with Plaintiff's October of 2011 MRI, (*see* R. 266) and even then only as to certain parts. Despite this, the ALJ appears to discount that MRI entirely and credit only what he described as the "relatively normal" MRI from April of 2012, (R. 33).

early MRI's of [Plaintiff's] spine document a very serious condition, physicians actively disagreed with the interpretation of this study." (R. 32.) The ALJ continued to note that "updated studies performed in 2012 show only a mild to moderate back disorder." (R. 32.) This is an impermissible substitution of the ALJ's "own expertise or view of the medical proof for the treating physician's opinion." *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). As a lay person, the ALJ is not in a position to determine whether Plaintiff's MRIs reflect, as he stated, a "relatively normal" lumbar spine, particularly where they admittedly also document any level of stenosis and disc bulges "without significant nerve improvement." (R. 33.) Nor is the ALJ in a position to determine whether the presence or absence of muscle spasms or a gait abnormality is dispositive of Plaintiff's functional capacity, as the ALJ seems to conclude. *See Rosa*, 168 F.3d at 79 ("Indeed, as a 'lay person' the ALJ simply was not in a position to know whether the absence of muscle spasms would in fact preclude the disabling loss of motion described by [the treating physician] in his opinion."); *see also Morgan v. Colvin*, 592 F. App'x 49, 49 (2d Cir. 2015) ("The ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." (alteration and citation omitted)).

Unless Dr. Perez's opinion of Plaintiff's functional limitation is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques," it should be given "controlling weight" provided it is "not inconsistent with the other substantial evidence in [Plaintiff's] record." *See* 20 C.F.R. § 404.1527(c)(2). Because the ALJ neither afforded Dr. Perez's opinions controlling weight nor adequately supported his decision to accord them little weight, and instead substituted his own lay opinion of the medical proof, the ALJ erred in his treatment of Dr. Perez's medical-opinion evidence.

## B. Dr. Reich

Plaintiff began seeing Dr. Reich on May 20, 2013, on a weekly or biweekly basis. (*See* R. 210–211.) On September 26, 2013, Dr. Reich wrote a letter for Plaintiff's workers' compensation plan, expressing that Plaintiff was angry and frustrated by her limitations and struggled to find meaning in her daily life. (R. 574.) She slept poorly and was in continuing pain. (R. 574.) Dr. Reich opined that Plaintiff was permanently impaired and could not function without the antidepressant she was receiving from Dr. Conciatori-Vaglica. (R. 574.)

On February 25, 2014, Dr. Reich wrote a psychological report in which she diagnosed Plaintiff with anxiety-related disorders and affective disorder. (R. 206–209.) Dr. Reich assessed Plaintiff a GAF score of 55. (R. 206.) Plaintiff reported increased arguments with family members, feelings of isolation and withdrawal, hopelessness, worthlessness and low self-esteem. (R. 206–07.) Plaintiff reported that her pain interfered with activities of daily living, such as putting on socks or taking a shower. (R. 207.) Dr. Reich's examination of Plaintiff revealed that she was well oriented. (R. 207–08.) However, her memory for recent events was severely impaired. (R. 207.) Plaintiff's motor behavior was abnormal, her gait was disturbed and her mood was depressed, irritable and anxious. (R. 207.) Dr. Reich opined that Plaintiff had moderate restrictions regarding her activities of daily living and that she had severe difficulties in maintaining social functioning, concentrating and completing tasks in a timely manner. (R. 208.) Dr. Reich also noted that Plaintiff had severe episodes of deterioration or decompensation. (R. 208.)

The ALJ assigned "little weight" to Dr. Reich's medical source statement and GAF assessment, reasoning that they were "inconsistent with [Plaintiff's] lack of mental health treatment" and "there is little objective evidence in the form of mental status examination results

contained in the case file." (R. 30.) The ALJ also found that Plaintiff's "own statements contradict [Dr. Reich's] overall conclusions" because Plaintiff reported being able to finish what she starts and to follow instructions, and stated that she can pay bills, count change and handle a savings account. (R. 30.)

To the extent that the ALJ's conclusions rested on the absence of "objective" mental status examinations or consistent case file notes from a psychiatrist, (*see* R. 30), the ALJ was required to develop the record and to obtain information relevant to a disability determination. *See Burgess*, 537 F.3d at 128; *see also Tankisi*, 521 F. App'x at 33. The record reflects that Plaintiff sought mental health treatment at Dr. Perez's behest, when he noticed her depressed mood as a result of not being able to work or take care of her family. (*See* R. 203.) According to Dr. Reich's notes, Plaintiff visited Dr. Reich consistently from May of 2013 through the ALJ's decision, which the ALJ acknowledged in his decision and which does not reflect a "lack of mental health treatment."[9] (R. 30, 210–11.) It is true that few of Dr. Reich's treatment notes or mental status examinations are included in the record, but neither party disputes that Plaintiff visited Dr. Reich for over a year and that Dr. Reich qualifies as Plaintiff's treating psychiatrist. "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot

---

[9] In any event, it is not clear that an ALJ may discount a treating psychiatrist's opinion for a claimant's failure to seek regular or consistent treatment. Social Security Regulation 16-3p indicates that ALJs will "consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed" and, before finding that the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall record, will "consider[] the possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." Soc. Sec. Reg. 16-3p. The regulation then illustrates possible reasons an individual may not have pursued treatment. *Id.* This guidance specifically applies in assessing a claimant's credibility, however, and does not seem to apply in weighing the opinion of a treating medical source. *See Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (enumerating the factors that an ALJ must consider before discounting a treating physician's opinion).

reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" *Burgess*, 537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79)). The ALJ apparently did not attempt to acquire Dr. Reich's notes from these regular sessions and, in so doing, failed in his duty to develop the record.

The ALJ also failed to give good reasons for not crediting Dr. Reich's opinion regarding Plaintiff's mental health. As a treating physician, Dr. Reich's opinion is given "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."[10] *Id.* at 128 (quoting 20 C.F.R. § 404.1527(d)(2)). "Medically acceptable clinical and laboratory diagnostic techniques include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." *Id.* (alterations omitted) (quoting *Green-Younger*, 335 F.3d at 107); *see also Showers v. Colvin*, No. 13-CV-1147, 2015 WL 1383819, at *8 n.18 (N.D.N.Y. Mar. 25, 2015) ("It is axiomatic that a treating psychiatrist must consider a patient's subjective complaints in order to diagnose a mental disorder." (quoting *Santana v. Astrue*, No.

---

[10] Although the Commissioner's memorandum notes that Dr. Reich's observations conflicted with certain of Dr. Conciatori-Vaglica's notes, (*see* Comm'r Mem. 23.), the ALJ failed to consider Dr. Conciatori-Vaglica's opinion whatsoever. This may be because, at the time of the ALJ's hearing and decision, Plaintiff had visited Dr. Conciatori-Vaglica only once, on July 5, 2013. (R. 210–12.) However, after her hearing before the ALJ on March 7, 2014, Plaintiff saw Dr. Conciatori-Vaglica for regular treatment in April, May, June and July of 2014, and Dr. Conciatori-Vaglica noted that Plaintiff had unsuccessfully attempted to make follow-up appointments with her in 2013. (R. 656–68.) This evidence was submitted to the Appeals Council, which subsequently denied review of the ALJ's decision. Because the Court remands for other reasons, it need not consider whether this evidence is "new evidence" that is "material." *See* 42 U.S.C. § 405(g); *see also Raitport v. Callahan*, 183 F.3d 101, 104 (2d Cir. 1999). The additional evidence from Dr. Conciatori-Vaglica will be part of the record on remand, however, and the ALJ should consider it accordingly. *See Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996) ("[W]e hold that the new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision.").

12-CV-815, 2013 WL 1232461, at *14 (E.D.N.Y. Mar. 25, 2013))). "This is especially true for diagnoses of mental disorders because unlike orthopedists, for example, who can formulate medical opinions based upon objective findings derived from objective clinical tests, scans or x-rays, a psychiatrist typically treats the patient's subjective symptoms or complaints about those symptoms." *Santana*, 2013 WL 1232461, at *14. In view of this, the Court finds unpersuasive the Commissioner's argument that Dr. Reich's opinion was "completely unreliable" because she merely "repeat[ed] Plaintiff's own subjective and self-serving statements." (Comm'r Mem. 23.) Indeed, it is not clear what "objective" medical evidence or tests the ALJ would have had Dr. Reich perform to confirm Plaintiff's subjective reports of anxiety and depression or the episodes of decompression. Dr. Reich assessed a GAF score based on her observations of Plaintiff over the course of one year of treatment. The fact that, in doing so, Dr. Reich relied in some part on Plaintiff's subjective complaints does not undermine her opinion as to Plaintiff's mental health, particularly where the ALJ did not develop the record to determine whether any "objective" medical evidence actually exists.

### 2. Consultative examiners – Dr. Portnoy and Dr. Brahms

Under the SSA, a "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902. In general, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182–83 (E.D.N.Y. 2011) ("[T]he opinion of a

consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.'" (quoting *Cruz*, 912 F.2d at 13)). Nevertheless, the opinions of consultative examining medical sources can constitute substantial evidence in support of the ALJ's decision if they are supported by evidence in the record. *See Petrie*, 412 F. App'x at 405 ("The report of a consultative physician may constitute [] substantial evidence [by which to compare the treating physician's opinion]."); *Mongeur*, 722 F.2d at 1039 ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence." (citations omitted)).

Here, having improperly discounted the opinion of Plaintiff's treating physician, Dr. Perez, the ALJ instead credited the opinions of Dr. Portnoy, a chiropractor,[11] and Dr. Brahms, who submitted written interrogatory responses after a review of Plaintiff's file. (*See* R. 34.) Although the opinions of consultative examining medical sources can constitute substantial evidence by which to compare the treating physician's opinion, *see Petrie*, 412 F. App'x at 405, the ALJ made no effort to reconcile Dr. Portnoy's or Dr. Brahms' findings with those of Dr.

---

[11] Plaintiff argues that Dr. Portnoy's position as a chiropractor makes him an unacceptable medical source on which to rely, according to the Commissioner's regulations. (*See* Pl. Mem. 21; 20 C.F.R. § 404.1513 (listing "acceptable medical sources").) It is true that "[i]nstead, chiropractors are expressly listed in a different section under 'other sources' whose 'information . . . may also help us to understand how your impairment affects your ability to work.'" *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995) (quoting 20 C.F.R. § 404.1513(e), *as amended*, 20 C.F.R. § 404.1513(d)(1) (2013)). The ALJ did not impermissibly rely on Dr. Portnoy's characterization of Plaintiff's impairment as "lumbar syndrome,"(*see* Pl. Mem. 21); the ALJ instead properly relied on Dr. Portnoy's assessment of "the severity of [Plaintiff's] impairment(s) and how it affects [her] ability to work," (*see* 20 C.F.R. § 404.1513(d)).

Perez.[12]  The failure to provide "good reasons" for crediting the opinions of Dr. Brahms and Dr. Portnoy over those of Dr. Perez warrants remand.  *See Selian*, 708 F.3d at 419 (citing *Snell*, 177 F.3d at 133)).

### ii.  The ALJ improperly assessed Plaintiff's RFC

Plaintiff argues that the ALJ failed to consider Plaintiff's pain medications and their side effects in evaluating her RFC.  (Pl. Mem. 23–24.)  The Commissioner argues that the ALJ properly considered Plaintiff's medication and pain complaints and, in any event, need not cite every shred of evidence that is considered.  (Comm'r Mem. 24.)

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations."  20 C.F.R. § 404.1545.  With respect to a claimant's physical abilities, an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis.  *Id.* § 404.1545(b).  For example, "a limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work."  *Id.*  In determining the RFC, the ALJ must consider

---

[12]  In fact, the ALJ assessed Dr. Brahms' evidence by noting that he specializes in orthopedics, "which falls within the area of the claimant's impairment," and concluding without further analysis that "[h]is conclusions are well supported by the objective diagnostic studies of the claimant's lumbar spine, which only document disc bulges with nerve root abutment."  (R. 35.)  The remainder of the ALJ's treatment of Dr. Brahms' opinion appears to be in error, as the ALJ continues with the exact language used to describe the discredited opinions of Drs. Perez, Shiau and Segreto: "Their conclusions regarding the claimant's degree of disability are also inconsistent with the medical evidence of record, which fails to document any significant signs of nerve root with the claimant's conservative course of treatment and her activities of daily living . . . ."  (R. 35.)  This discussion directly contravenes the "great weight" the ALJ assigned to Dr. Brahms' opinion because it appears to refer to multiple doctors and discredits opinions that Dr. Brahms did not reach.

"the combined effect of a claimant's impairments . . . on [her] ability to work, regardless of whether every impairment is severe." *McIntyre*, 758 F.3d at 151–52. This requires the ALJ to consider "all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [the p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, No. 07-CV-0803, 2009 WL 1940539, at *9 (N.D.N.Y. July 6, 2009) (citing 20 C.F.R. § 404.1545(b–e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010); *see also* 20 C.F.R. § 404.1545 ("In assessing the total limiting effects of your impairment(s) and any related symptoms, we will consider all of the medical and nonmedical evidence . . . .").

As part of evaluating the intensity and persistence of Plaintiff's symptoms and determining the extent to which those symptoms limit Plaintiff's capacity for work, the ALJ was required to "carefully consider" as "an important indicator" information regarding "what may precipitate or aggravate [Plaintiff's] symptoms, what medications treatments or other methods [Plaintiff] use[s] to alleviate them, and how the symptoms may affect [her] pattern of daily living." *See* 20 C.F.R. § 404.1529(c)(3); *see id.* (3)(i)–(vii) (noting that the ALJ "will consider," among other things, "the location, duration, frequency, and intensity of your pain or other symptoms" and "the type, dosage, effectiveness, and side effects of any medication you have taken"); Soc. Sec. Reg. 96-8p ("The RFC assessment must be based on *all* of the evidence in the case record, such as . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication) . . . .").

Contrary to the Commissioner's argument, the ALJ did not "consider Plaintiff's medication, epidural injections, and physical therapy." (*See* Comm'r Mem. 24.) The ALJ simply noted that "the record reflects treatment with physical therapy, epidural injections, and

medication management" in order to arrive at the broader conclusion that Plaintiff's conservative course of treatment belied her complaints. (*See* R. 33.) This passing reference to Plaintiff's course of pain management is insufficient to satisfy the ALJ's requirements under the Social Security Regulations to consider all of the relevant evidence in making an RFC determination. Plaintiff's physicians prescribed Hydrocodone, Nucynta, Vicodin, Exalgo and Butrans patches, which are all narcotics used to manage pain. (R. 51–53, 154, 191, 504, 595.) When she initially applied for benefits, Plaintiff explained that her medications made her drowsy and gave her a headache. (R. 191–92.) She repeated this complaint to the ALJ at her hearing, explaining that her daily activities were affected in great part by her reaction to the daily medications. (R. 51–52.) The record contains several references to altering Plaintiff's medications because she reacted more poorly to some than to others. (*See, e.g.*, R. 214, 574, 662.) On remand, the ALJ should account for the limitations imposed by these medications in determining Plaintiff's RFC. *See Parker-Grose*, 462 F. App'x at 18.

## III. Conclusion

For the foregoing reasons, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion for judgment on the pleadings   The Court vacates the Commissioner's decision and remands this action for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 22, 2017
      Brooklyn, New York